**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

BRIAN ALLAIRE, individually and on behalf of all others similarly situated,

*Plaintiff,*

v.

McDONALD'S CORPORATION; McDONALD'S USA, LLC; and DELOITTE CONSULTING LLP,

*Defendants.*

Case No.

JURY TRIAL DEMANDED

# CLASS ACTION COMPLAINT

## TABLE OF CONTENTS


I. Nature of the Action .......... 1

II. Parties .......... 3

A. Plaintiff .......... 3

B. Defendants .......... 3

C. Co-Conspirators .......... 5

III. Jurisdiction and Venue .......... 5

IV. Factual Allegations .......... 6

A. McDonald's Designed Its Restaurants to Compete as Independent Businesses .......... 6

B. Before the McDonald's Pricing System, McDonald's Pricing Was Decentralized, Followed Costs, and Rose Modestly .......... 7

C. The McDonald's Pricing System .......... 10

1. McDonald's Collects Confidential Data from Every Competing Restaurant .......... 10

2. McDonald's Controls the McDonald's Pricing System .......... 10

3. McDonald's and Its Franchised Competitors All Price Using the McDonald's Pricing System .......... 14

4. The System Uses Pooled Competitor Data to Set Competing Restaurants' Prices .......... 15

D. Deloitte Operates the Franchisee-Facing Layer of the McDonald's Pricing System .......... 16

E. McDonald's Issues Recommendations in Coordinated "Pricing Rounds," and Franchisees Follow Them .......... 18

F. McDonald's Prices Have Increased Every Year Since 2019 .......... 19

G. McDonald's Monitors and Enforces Compliance .......... 22

H. Competing Restaurants Also Coordinate Directly .......... 25

I. The McDonald's Pricing System Is Not Ancillary to any Legitimate Agreement .......... 26

J. Defendants Concealed the Conspiracy ....27

K. Enforcement Context ....28

V. Evidence of Agreement....29

A. Direct Evidence....29

B. Each Restaurant Knew that It Was Part of a System-Wide Arrangement....29

C. Parallel Conduct....30

1. Parallel Adoption of the McDonald's Pricing System.... 30

2. Parallel Price Increases .... 31

D. Plus Factors....32

1. Exchange of Competitively Sensitive Information.... 32

2. Actions Against Unilateral Self-Interest.... 32

3. Market Conditions Conducive to Collusion .... 34

4. Opportunities and Mechanisms to Collude.... 34

VI. Relevant Market and Market Power ....34

VII. Antitrust Injury....36

VIII. Class Action Allegations....38

IX. Count I—Violation of Section 1 of the Sherman Act, 15 U.S.C. §1 (Price Fixing) ....39

X. Count II—Violation of Section 1 of the Sherman Act, 15 U.S.C. §1 (Information Exchange) ....40

XI. Prayer for Relief....42

XII. Jury Demand ....42

Plaintiff Brian Allaire ("Plaintiff"), individually and on behalf of the Class defined below, brings this action against Defendants McDonald's Corporation and McDonald's USA, LLC (collectively, "McDonald's") and Deloitte Consulting LLP ("Deloitte," and together with McDonald's, "Defendants") for violations of Section 1 of the Sherman Act, 15 U.S.C. §1. Plaintiff's allegations are made upon personal knowledge as to himself and upon information and belief as to all other matters. Plaintiff's information and belief are based on the investigation of counsel, which included review of Defendants' securities filings, transcripts of earnings calls and investor conferences, franchise disclosure documents, public statements, regulatory submissions, court filings, and news reports.

## I. NATURE OF THE ACTION

1. Roughly 95% of the approximately 13,500 McDonald's restaurants in the United States are owned and operated by independent franchisees—the other 5% are owned by McDonald's corporate ("McOpCo," as defined below). And McDonald's has told investors that its franchisees "maintain control over all employment related matters, marketing and pricing decisions," similarly assuring customers that franchisees "set menu prices for their restaurants."

2. The reality is different, though. Beginning no later than 2019, McDonald's, the restaurants it owns, and its franchisees have set menu prices through one common pricing tool under McDonald's control (the "McDonald's Pricing System"). McDonald's has referred to the tool in a number of ways, including as its "menu pricing engine," its "pricing recommendation tool," its "Base Pricing Engine," and "a suite of proprietary pricing tools." Franchisees know it as the "McDonald's Pricing Analyzer." Every competing franchisee restaurant feeds its confidential transaction data to McDonald's, and the McDonald's Pricing System uses that pooled data from competing restaurants to produce price recommendations for each item at each restaurant, which are issued in coordinated "pricing round[s]." The McDonald's Pricing System was developed by

the consulting firm Deloitte and McDonald's own in-house revenue growth management operation.

3. McDonald's executives have explained the relationship with Deloitte to its investors, with its CEO saying, "Both we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services." McDonald's former CFO similarly stated, "We use a third-party adviser that advises the franchisees as well as the company on pricing." Its subsequent CFO reported, when the price increases were at their greatest, that "we're still seeing very strong adherence with our franchisees to our pricing recommendations." And McDonald's CEO even admitted that McDonald's had developed the capability "to know exactly by item, by restaurant, the ability for us *to take pricing*." (Emphasis added).

4. Customers have borne the consequences. McDonald's U.S. prices have gone up every year since 2019. Prices rose approximately 6% in 2021, 10% in 2022, and another 10% in 2023, and they have continued to climb in 2024, 2025, and 2026. McDonald's itself calculates that its average menu item was roughly 40% more expensive in 2024 than in 2019. According to McDonald's, the guidance of its pricing advisers, and the "data and analytical capability" supporting that guidance, enabled it to raise prices "in a way that has minimized the resistance from the customer," further noting that "even though *we're pushing through pricing*, the consumer is tolerating it well." (Emphasis added).

5. Franchisees comply with the pricing recommendations from the McDonald's Pricing System because the success of their businesses hinge on their obedience. The cost to open a McDonald's restaurant is estimated to be between $1,471,000 and $2,728,000. Franchisees have "no right to renew" their franchise licenses; whether they may renew or expand turns on McDonald's evaluation of them at periodic "Business Reviews," and McDonald's has folded

pricing compliance into those reviews. Since January 2026, franchisees have been required to be "constructively engaging with McDonald's approved Pricing Consultant and Tools." McDonald's CEO has acknowledged to investors that "pricing noncompliance" is now a factor in Business Reviews bearing on franchisees' "growth and eligibility" to keep operating or to expand.

6. Ironically, McDonald's has itself complained about such conduct. When McDonald's, as a purchaser, paid inflated prices for pork, it sued its suppliers for exchanging confidential data through a shared intermediary, describing that scheme as "the modern equivalent of the proverbial smoke-filled room." Compl. ¶3, *McDonald's Corp., v. Agri Stats Inc.*, No. 0:22-cv-03106 (D. Minn. Nov. 25, 2022), ECF No. 1.

7. The result of the McDonald's Pricing System is a horizontal conspiracy among competitors—i.e., the McOpCo-owned McDonald's restaurants and each of the franchises—to fix prices. An agreement among competitors to fix, raise, or stabilize prices is unlawful *per se*.

8. Plaintiff purchased menu items from franchise McDonald's restaurants and paid more than he would have paid had those restaurants set their prices independently. Plaintiff seeks treble damages and injunctive relief on behalf of himself and the Class.

## II. PARTIES

### A. Plaintiff

9. Plaintiff Brian Allaire resides in Amston, Connecticut. During the Class Period, Mr. Allaire bought menu items from multiple McDonald's restaurants and, because of the conduct alleged herein, paid supracompetitive prices.

### B. Defendants

10. Defendant McDonald's Corporation is incorporated in Delaware and headquartered in Chicago, Illinois. It is the parent company of McDonald's USA, LLC and of its subsidiaries that own the company-operated McDonald's restaurants in the United States (the "McOpCo"

restaurants). The statements about the McDonald's Pricing System described in this Complaint were made by current or former McDonald's Corporation officers, including Chairman and Chief Executive Officer Christopher Kempczinski and Chief Financial Officers Kevin Ozan and Ian Borden. McDonald's Corporation also created a "revenue growth management function" that, on information and belief, seeks to increase profits by, among other things, coordinating pricing.

11. Defendant McDonald's USA, LLC is a Delaware limited liability company headquartered in Chicago, Illinois, and is wholly owned by McDonald's Corporation. McDonald's USA, LLC is the franchisor under the current U.S. franchise agreements; it issues the McDonald's Franchise Disclosure Document, administers the National Franchising Standards and Business Reviews, and charges franchisees a fee for "the use of the Base Pricing Engine." Accordingly, McDonald's USA, LLC, at a minimum, oversees and controls the McDonald's Pricing System and profits from the conspiracy alleged herein.

12. McDonald's sells menu items to consumers at McOpCo restaurants, which compete with franchised restaurants. McDonald's represents to investors that it makes 100% of investments in McOpCo restaurants, and receives 100% of operating profits from McOpCo restaurants. McDonald's thus is both the organizer of the conspiracy and a horizontal competitor of the franchisees that take part in it.

13. Defendant Deloitte Consulting LLP, a subsidiary of Deloitte LLP, is a Delaware limited liability partnership whose principal place of business is in New York, New York. Deloitte's pricing practice created the "Strategic Pricing Analyzer," which, on information and belief, is the same "McDonald's Pricing Analyzer" that franchisees use to review the recommendations generated by the McDonald's Pricing System.

14. Deloitte also employs and supervises "Pricing Advisors" who deliver pricing to restaurant clients. Within a "dedicated region," each Pricing Advisor acts as "the client's first point of contact to solve their pricing needs," relies on "a custom-built pricing optimization solution" to "make appropriate recommendations," and "[p]resent[s] pricing trends during regional client meetings (2-3x per year)." On information and belief, Deloitte's Pricing Advisors provide the McDonald's Pricing System's recommendations to competing McDonald's restaurants, and Deloitte is the "approved Pricing Consultant" with which McDonald's has, since January 2026, required franchisees to be "constructively engaging." Deloitte took part in the conspiracy alleged herein as an independent co-conspirator and not merely as McDonald's agent.

### C. Co-Conspirators

15. The co-conspirators include every McDonald's franchisee in the United States and the McOpCo subsidiaries. Each Defendant is jointly and severally liable for the acts its co-conspirators—whether or not those co-conspirators are named as defendants—took in furtherance of the conspiracy.

## III. JURISDICTION AND VENUE

16. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26. Jurisdiction also exists under 28 U.S.C. §1332(d) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the Class is a citizen of a State different from at least one Defendant.

17. This Court has personal jurisdiction over each Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22, and Federal Rule of Civil Procedure 4(k). McDonald's Corporation and McDonald's USA, LLC are headquartered in this District. Deloitte has offices in

this District and, on information and belief, staffed its pricing engagement for McDonald's in part from this District.

18. Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391(b) and (c) because Defendants transact business and are found here, and a substantial part of the events giving rise to Plaintiff's claims, including the operation and enforcement of the McDonald's Pricing System, took place in this District.

19. Defendants' conduct had a substantial effect on interstate commerce. McDonald's restaurants operate in every State and in the District of Columbia, and the McDonald's Pricing System generated prices for restaurants across the country.

## IV. FACTUAL ALLEGATIONS

### A. McDonald's Designed Its Restaurants to Compete as Independent Businesses

20. McDonald's collects a royalty of 4% or 5% of each franchised restaurant's gross sales, in addition to a percentage of rent and other fees, and it keeps all sales of McOpCo restaurants. As a result, McDonald's profits directly from higher menu prices so long as customers continue to buy menu items.

21. Every franchisee is a distinct business. Under McDonald's franchise agreements, a franchisee "shall have no authority, express or implied, to act as agent of McDonald's" and "is, and shall remain, an independent contractor." It further states that the franchisee and McDonald's "are not and do not intend to be partners, associates, or joint employers in any way."

22. McDonald's informs franchisees that they will compete both with each other and with McDonald's. The franchise agreement confers no "exclusive grant, exclusive area, exclusive territorial rights, [or] protected territory," and cautions that the franchisee "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control." In 2023, McDonald's told the Federal Trade Commission

that it intentionally withholds exclusive territorial rights so that franchisees face competition from other McDonald's restaurants.

23. McDonald's represents that menu pricing is a decision for the franchisee alone. According to its annual reports, franchising allows an individual restaurant to "maintain control over all employment related matters, marketing and pricing decisions." The President of McDonald's USA told customers that franchisees "set menu prices for their restaurants."

24. The restaurants McDonald's owns compete head-to-head with franchised restaurants. In prior litigation against McDonald's, this Court found that "McDonald's franchisees and McOpCos within a locale are direct, horizontal, competitors." *Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955, at *8 (N.D. Ill. June 25, 2018). And this was confirmed by the Seventh Circuit. *See Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) ("This made the arrangement horizontal.").

25. But for the conspiracy, each franchisee and each McOpCo restaurant would price its menu items independently, taking into account factors such as its own costs and its own customers.

### B. Before the McDonald's Pricing System, McDonald's Pricing Was Decentralized, Followed Costs, and Rose Modestly

26. Before the McDonald's Pricing System existed, McDonald's set prices based on inflation and costs. In 2022, McDonald's head of investor relations explained that "years ago," McDonald's pricing discussions focused more on food-away-from-home and food-at-home inflation and that those measures "aren't necessarily like driving decisions as much as they probably once were years ago."

27. As of 2019, McDonald's U.S. price increases broadly kept pace with its costs. For the first quarter of 2019, McDonald's reported U.S. pricing "up about 2%" against commodity cost

increases of "approximately 3%"; for the third quarter of 2019, it reported U.S. pricing "up nearly 3%" against commodity cost increases of "about 2%." McDonald's CEO characterized 2019 check growth (the average amount spent per transaction, reflecting both price and the mix of items ordered) as "heavily mix-driven," with a "pricing element" considering labor inflation that "does get priced through," i.e., is passed on in final prices.

28. Pricing capabilities at McDonald's were decentralized at that time. McDonald's CEO explained at the company's 2026 Investor Day that, before McDonald's reorganized to centralize pricing decisions in 2019, "[b]usiness functions, including menu, restaurant design, pricing analytics, indirect procurement and consumer insights were all decentralized." He added that before McDonald's launched its current pricing strategy, "[w]e didn't have [a] revenue growth management function"—i.e., a system that coordinates pricing, promotions, and product assortment to increase profits.

29. Beginning in approximately 2019, though, McDonald's substantially changed its approach to pricing with franchisees. In December 2023, McDonald's acknowledged that "[o]ver the last several years, we've significantly improved our pricing capabilities."

30. Although McDonald's gathered restaurant-level transaction data well before 2019, it did not offer a pricing tool. Thus, while McDonald's 2017 Franchise Disclosure Document ("FDD") noted that McDonald's had "independent access to your sales and other restaurant-level information" and required franchisees to provide monthly "individual restaurant profit and loss statement(s)," it did not mention either a pricing engine nor a fee for a pricing tool. The 2025 FDD, in contrast, revealed that McDonald's was charging franchisees a fee "for the use of the Base Pricing Engine."

31. In October 2018, while McDonald's franchisees were forming an owners' association, a third-generation franchisee cautioned that "[t]he next control change will be the transfer of Menu Board Pricing to Deloitte and Touche," and that "[o]ur ability to price our menu boards may be one of the last controls we still have." George Michell, an owner/operator of 37 McDonald's restaurants, in a lawsuit against McDonald's, noted that he (along with other McDonald's franchisees) used Deloitte's McDonald's Pricing Analyzer to set prices since April 2019. This is consistent with a Reuters report that McDonald's "has used some form of an AI pricing tool since at least 2019."

32. In February 2020, Deloitte publicized its rollout of a restaurant pricing engine to several thousand stores of a top restaurant chain "[d]eveloped with one of the world's leading restaurants," a reference, on information and belief, to McDonald's. In February 2021, Reuters reported that "[m]any McDonald's franchisees turn to consulting firm Deloitte for advice on how to set optimal pricing," citing as an example Deloitte's recommendation of a $3.69 price for the spicy and crispy versions of McDonald's new chicken sandwiches.

33. McDonald's executives described this change in pricing methodology on multiple occasions. For example, in July 2021: "[B]oth we and our franchisees take a more consumer research-based approach than we would have several years ago." In October 2021: "Both we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services." In July 2023, McDonald's said it had developed its pricing "capabilities" with "our third-party advisers[.]" And in April 2024: "[W]e've done a lot over the last several years building our pricing capabilities."

34. Plaintiff alleges that the conspiracy began no later than 2019, when, on information and belief, McDonald's company-owned and franchised restaurants started setting prices through

the McDonald's Pricing System, which generated recommendations from pooled competitor data and was designed to move prices in lockstep across competing restaurants rather than to reflect each restaurant's independent assessment of its own costs and competitive position.

## C. The McDonald's Pricing System

### 1. McDonald's Collects Confidential Data from Every Competing Restaurant

35. McDonald's requires franchisees to send it their confidential sales data. As the 2025 FDD states, "The restaurant's transaction-level information generated by the POS [Point of Sale], including sales, transactions, and product mix information, is stored on your server hardware and transmitted to McDonald's and held on its servers. McDonald's has independent access to this information and there are no contractual limits on its right to access such information."

36. McDonald's likewise has access to aggregated cashless and gift-card transaction information, and franchisees are required to submit monthly financial statements, such as "individual restaurant profit and loss statement(s)," through McDonald's Franchisee Financial System.

37. McDonald's maintains records of these nonpublic prices, unit sales, product mix, costs, and profit margins of every competing restaurant. On information and belief, franchisees cannot access their competitors' nonpublic transaction data in the ordinary course, and the McDonald's Pricing System is the mechanism through which each restaurant's nonpublic data shapes the prices its competitors charge.

### 2. McDonald's Controls the McDonald's Pricing System

38. The McDonald's Pricing System is a tool used by McDonald's and its franchisees to set prices. Over time, McDonald's and its franchisees have called it by various names. Franchisees have known it as the "McDonald's Pricing Analyzer." McDonald's has referred to it

as "a suite of proprietary pricing tools," its "Base Pricing Engine," its "approved Pricing Consultant and Tools," its "menu pricing engine," and its "pricing recommendation tool." On information and belief, each of these names refers to the same pricing tool controlled by McDonald's (referred to in this Complaint as the "McDonald's Pricing System"), or to successive iterations of that tool.

39. By April 2019, franchisees were setting retail prices with Deloitte's "McDonald's Pricing Analyzer." By 2023, McDonald's had assembled "a talented internal team" to support its pricing tools, and by 2026 it had its own "revenue growth management function"—the knowledge required to coordinate pricing, promotions, and product assortment to grow revenue profitably. Additionally, two former employees have reported that Tiger Analytics now runs McDonald's pricing engine and that McDonald's routinely supplies the engine's rules and corporate targets—i.e., McDonald's-set objectives that shape the engine's pricing recommendations.

40. Public sources do not reveal how the work of Deloitte, Tiger Analytics, and McDonald's internal team has been allocated or sequenced. On information and belief, Deloitte and Tiger Analytics have each built or operated the McDonald's Pricing System in coordination with McDonald's.

41. Deloitte has publicly described a restaurant pricing engine that matches the McDonald's Pricing System. In February 2020, Deloitte marketed a "Strategic Pricing Analyzer" for restaurants that it said had been "developed with one of the world's leading restaurants." As Deloitte described it, the tool used artificial intelligence and machine learning to combine store-level sales, price, and cost data with economic and competitive data; applied business rules furnished by the restaurant; delivered recommendations through an online portal into which restaurant managers log; aligned menu prices with what customers were willing to pay; and was

supported by in-market pricing advisors. Deloitte reported rolling out the tool across several thousand stores of a leading restaurant chain and was offered compensation based on a percentage of the incremental profit the tool produced. On information and belief, that restaurant chain is McDonald's, and the tool Deloitte described is the "McDonald's Pricing Analyzer." As Figure 1 shows, the Pricing Analyzer's login page, titled "Pricing Analyzer" and inviting users to "Log in to review pricing recommendations and performance," displays both the McDonald's Golden Arches logo and Deloitte's name.

**FIGURE 1: Login Page of the McDonald's "Pricing Analyzer"**




42. McDonald's centrally controls the McDonald's Pricing System. At McDonald's September 2026 Investor Day, its CEO explained that McDonald's had restructured previously decentralized functions, "pricing analytics" among them, to create "one McDonald's way of operating," resting on "a single enterprise data foundation." McDonald's also touted its "menu pricing engine" as "an industry-leading tool that provides franchisees with pricing recommendations down to the restaurant and item level," "[i]nformed by insights from millions of

transactions and a broad range of market data." In August 2026, McDonald's CEO told investors that McDonald's was "close to having all our major markets on . . . one pricing engine[.]"

43. In its 2022 Form 10-K, McDonald's stated that "*The Company* has demonstrated an ability to manage . . . cost increases effectively through *its* rapid inventory turnover, *ability to adjust menu prices*, cost controls and substantial property holdings, many of which are at fixed costs." (Emphasis added). Additionally, in earnings reports filed with the SEC in 2025 and 2026, McDonald's stated, "[W]e believe *our* ability to compete successfully in the current market environment depends on *our* ability to . . . price *our* products appropriately." (Emphasis added).

44. Further demonstrating the centralized nature of pricing, McDonald's was hiring in 2026 for a Senior Director of Revenue Growth Management Solution Delivery, with responsibilities including to "establish and execute the enterprise roadmap for RGM capabilities, *including menu pricing*." (Emphasis added).

45. In December 2025, McDonald's USA Chief Restaurant Officer wrote in a memo to U.S. franchisees that McDonald's is strengthening "individual accountability for value leadership – equipping you with approved pricing consultants, tools, and other levels of support."

46. Effective January 1, 2026, McDonald's formally required that the McDonald's Pricing System be used in restaurants. McDonald's now requires franchisees to be "constructively engaging with McDonald's approved Pricing Consultant and Tools," and it evaluates franchisees' pricing during Business Reviews. Under McDonald's New Term Policy, those reviews inform whether a franchisee is granted a new franchise term when its 20-year term ends and whether it may acquire additional restaurants. Using the McDonald's Pricing System is, as a practical matter, not optional.

### 3. McDonald's and Its Franchised Competitors All Price Using the McDonald's Pricing System

47. McDonald's executives confirmed on multiple occasions that McDonald's company-owned restaurants and the franchised restaurants that compete with them priced menu items using the McDonald's Pricing System. CEO Christopher Kempczinski stated, "Both we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services." Former CFO Kevin Ozan explained that franchisees are "advised by a third party, and the pricing mechanism or methodology that's used is a consumer-based research approach. We . . . generally try and take small increments of pricing at various times." CFO Ozan also stated, "[W]e do work closely with our franchisees on pricing. We use a third-party adviser that advises the franchisees as well as the company on pricing." And CFO Ian Borden stated that McDonald's works with "third-party advisers . . . who make recommendations to our business, including our franchisees, on how we price."

48. McDonald's views the pricing recommendations of the McDonald's Pricing System as its own. In October 2022, McDonald's CFO spoke of "our pricing recommendations." Discussing the U.S. business in October 2023, he referred to advisers "who obviously make pricing recommendations to our business, including our franchisees." McDonald's Head of Investor Relations likewise said that "we use a third party for . . . pricing recommendations."

49. McDonald's directs, and invests in, the McDonald's Pricing System. In January 2023, McDonald's CFO cited "the investments we've made over the last couple of years to really improve the tools, the data and the analytics that our advisers use to provide recommendations to the business."

### 4. The System Uses Pooled Competitor Data to Set Competing Restaurants' Prices

50. The McDonald's Pricing System relies on data pooled from competing restaurants. McDonald's CEO told investors that as more customers enter McDonald's digital ecosystem, "our pricing tools get sharper, our AI models get smarter." Reuters reported that the engine analyzes data from millions of daily transactions across McDonald's restaurants to calculate an optimal price for each item at each location.

51. McDonald's furnishes the rules and corporate targets that shape the McDonald's Pricing System's recommendations for each competing restaurant. Former Tiger Analytics employees report that those rules include concentrating increases on items whose prices have not been raised in at least two years.

52. The McDonald's Pricing System also gauges how large a price increase each restaurant's customers will endure. In a competitive market, the prices of nearby competing McDonald's restaurants would limit that endurance. Because the same system sets those competitors' prices using the same pooled data, the endurance it measures reflects the absence of that competition. Reuters reports that the franchisee interface shows each restaurant's price sensitivity, based in part on what customers are willing to pay in the restaurant's area. McDonald's CEO articulated the same objective: McDonald's studies pass-through rates (the portion of a price increase that results in higher sales rather than lost customers) "to make sure that we understand the consumer's willingness to accept any pricing."

53. Figure 2 illustrates the McDonald's Pricing System as alleged herein.

**FIGURE 2: The McDonald's Pricing System, as Alleged**




54. McDonald's is aware of the antitrust risk. Screenshots published by Reuters show that the pricing portal's terms of service caution that franchisees "may be competitors of each other," such that "it is particularly important for all Users of the Tool to understand and comply fully with anti-trust and competition laws." The terms also recite that franchisees are "always free to determine the final price," a disclaimer contradicted by McDonald's monitoring and enforcement, described below.

### D. Deloitte Operates the Franchisee-Facing Layer of the McDonald's Pricing System

55. Deloitte did more than simply license software to McDonald's. Deloitte's "Pricing Advisors" serve as "the client's first point of contact to solve their pricing needs," maintain client relationships in a "dedicated region," rely on "a custom-built pricing optimization solution" to

"make appropriate recommendations," adjust "pricing recommendations for the client" to reflect "local market events," and "[p]resent pricing trends during regional client meetings (2-3x per year)."

56. Deloitte has employed Pricing Advisors to advise McDonald's on its pricing since the inception of the McDonald's Pricing System. In May 2024, Deloitte posted a Chicago job opening for a pricing analyst "[s]upporting a premier client in the fast food restaurant industry," with the same duties, including presenting pricing trends at regional client meetings two to three times per year. On information and belief, that client is McDonald's.

57. Deloitte's Pricing Advisors give the McDonald's Pricing System's recommendations to competing McDonald's restaurants and Deloitte's "regional client meetings" assemble franchisees that compete with each other in the same region, where they receive the same pricing trends and guidance from the same Deloitte adviser. Notably, Deloitte knew that the restaurants it advised are competitors. The pricing portal's terms of service warn users that they "may be competitors of each other."

58. In the antitrust suit McDonald's itself brought against pork processors, McDonald's alleged that the detailed competitor pricing information exchanged through Agri Stats "is not the type of information that competitors would provide each other in a normal, competitive market." Compl. ¶3, *McDonald's Corp., v. Agri Stats Inc.*, No. 0:22-cv-03106 (D. Minn. Nov. 25, 2022). McDonald's also alleged that "in a truly competitive market, the participants would closely protect such proprietary information from disclosure as providing it to their competitors would be to their disadvantage – unless, of course, there was an agreement or understanding among them that they would use the information to the joint benefit of each other." *Id.* at ¶50.

59. On information and belief, Deloitte's compensation from McDonald's for its pricing advisory services was linked to the incremental profit generated by its pricing tool, giving Deloitte its own financial interest in higher prices. Further evidence of Deloitte's involvement in the implementation of McDonald's Pricing System is that in December 2019, following widespread adoption of the tool, the former CEO of Deloitte, Catherine Englebert, was elected to the McDonald's Board of Directors.

60. By delivering to each competing restaurant recommendations derived from those competitors' pooled data, and by gathering competing restaurants together to present shared pricing trends, Deloitte knowingly joined and advanced the conspiracy.

**E. McDonald's Issues Recommendations in Coordinated "Pricing Rounds," and Franchisees Follow Them**

61. McDonald's drives price increases through the franchise system in coordinated rounds. The CFO of McDonald's said in March 2022, "We generally will take smaller, more frequent increases than less frequent large increases." In June 2022, the Head of Investor Relations at McDonald's explained that "it takes us probably 6 to 8 weeks to get a good read on how a pricing round goes before we can decide what we might do next," and described the cadence of those increases as a "few times a year, not like weekly, monthly."

62. Franchisees follow pricing recommendations. In October 2022, when increases were at their peak, the CFO of McDonald's informed investors, "[W]e're still seeing very strong adherence with our franchisees to our pricing recommendations."

63. In January 2023, the McDonald's CEO told investors that "[o]ngoing communication with our franchisees regarding the magnitude and pace of pricing will remain essential" and that "our franchisees have been great about the pace of pricing." And in April 2023, he bragged that McDonald's had "built a very good capability over the last several years working

with some external partners to know exactly by item, by restaurant, the ability for us to take pricing. And what we see is that when we follow that . . . we're able to get the pricing that we need through." He also cautioned franchisees that "we need to stay very disciplined on pricing." During the same call, the McDonald's CFO commended "the discipline that both our owner/operators and our company restaurants are bringing" to pricing.

64. In December 2023, McDonald's made the following statement to investors:

> When we follow our pricing tools, our ability to price at a level that the consumer will accept is significantly better than when we don't, which maximizes the flow-through rate of our price increases to sales. Franchisees see the value in this and adoption rates for our pricing strategy are high.

**F. McDonald's Prices Have Increased Every Year Since 2019**

65. McDonald's own reports confirm that its U.S. prices have increased in every year that the McDonald's Pricing System has operated. In 2019, McDonald's reported first-quarter U.S. pricing "up about 2%" and third-quarter U.S. pricing "up nearly 3%." Over 2020 and into mid-2021, U.S. pricing rose approximately 6% year-over-year as of the second quarter of 2021, "[m]ost of [which] was pricing that was taken over the last year." For 2021 as a whole, U.S. pricing rose "a little over 6%." In 2022, U.S. pricing was up "roughly 8%" in the first quarter, "just over 10%" in the third quarter, and "about 10%" for the full year. In 2023, U.S. pricing was up by "low double-digit level[s]" in the second quarter and "just around 10%" for the full year.

66. The increases continued after 2023. For 2024, McDonald's projected U.S. pricing consistent with "low single-digit inflation," characterized its early-2024 U.S. pricing as "carryover pricing," and reported that 2024 U.S. comparable sales "benefit[ed] from average check growth, partly offset by negative comparable guest counts." In 2025, McDonald's reported a first-quarter U.S. menu price increase of "just under mid-single digit"; combo meals that "could be priced over $10" by mid-year; and 2025 U.S. comparable sales that "benefit[ed] from average check

growth"—i.e., growth in the average amount spent per transaction. And in 2026, McDonald's reported first-quarter comparable sales "primarily driven by positive check growth"—again, growth in the average amount spent per transaction—and, in the second quarter, "a fairly significant amount of price that got taken."

67. These increases built on one another. Compounding McDonald's reported annual menu price increases for 2021, 2022, and 2023 alone produces a cumulative increase of approximately 28%, and McDonald's reported that average menu prices in 2024 were roughly 40% above 2019 levels. Figure 3 illustrates how each year's increase was layered on top of the one before.

**FIGURE 3: Cumulative Increase in McDonald's U.S. Menu Prices, 2021–2023**




*Sources: McDonald's Corp. Q4 2021, Q4 2022, and Q4 2023 earnings calls (full-year U.S. pricing). Annual increases compounded. Baseline is 2020; price increases taken in 2020 are not included.*

68. McDonald's own figures show increases throughout the menu. McDonald's own website reports that from 2019 to 2024, the average price of medium fries increased 44%, a 10-piece McNuggets meal 28%, and a Big Mac meal 27%. Notably, despite these whopping increases, McDonald's chose to highlight those menu items to rebut claims that prices had doubled;

McDonald's conceded that, across the menu as a whole, average prices increased roughly 40% between 2019 and 2024, while the Consumer Price Index for food away from home increased 29% over the same period. Figure 4 depicts this comparison.

**FIGURE 4: McDonald's Average Menu Price Increase vs. Food-Away-From-Home Inflation, 2019 to 2024**




69. McDonald's attributed growth in U.S. comparable sales during this period to "strategic menu price increases." And McDonald's credited the McDonald's Pricing System—not merely rising costs—with making the increases stick. McDonald's reported that approximately 70% to 80% of its U.S. price increases kept flowing through to sales even as it raised U.S. prices by approximately 6% in 2021 and approximately 8% in early 2022. Addressing the U.S. business, the CFO credited "the data and analytical capability that comes from our third-party advisers who obviously make pricing recommendations to our business, including our franchisees," with allowing McDonald's to implement increases "in a way that has minimized the resistance from the customer and maximize[d] the flow-through that we're getting as a result of those price increases." Although McDonald's blamed the price levels themselves on "elevated cost and inflationary

pressures," and reiterated that franchisees make their own pricing decisions, it credited its pricing advisers' capability with getting customers to accept those prices.

70. McDonald's CEO explained that "there is no substitute for a Big Mac," that this "gives us pricing ability," and that McDonald's "tremendous pricing tools" had "guided us well[.]"

71. The increases have never been rolled back. Although the pace of increases may have slowed after 2023, McDonald's kept raising prices, and in August 2025 its CEO acknowledged that customers were still "seeing combo meals could be priced over $10[.]" McDonald's current value offers, including Extra Value Meals, are priced as discounts off menu item prices that went up every year from 2019 through at least 2025. Customers continue to pay the elevated prices established through the McDonald's Pricing System on their purchases to this day.

**G. McDonald's Monitors and Enforces Compliance**

72. To conceal the conspiracy, McDonald's tells investors publicly that "we give pricing recommendations, but ultimately, it's up to the franchisees as to whether they adopt those pricing recommendations." In reality, McDonald's knows and takes note whenever a restaurant departs from its recommendations. Because McDonald's provides each restaurant's recommended prices and receives each restaurant's transaction-level data, including the prices the restaurant actually charged, it is able to identify, and, on information and belief, does identify, every instance in which a restaurant prices an item differently from the recommendation. According to Reuters, which reviewed it, a June 2026 franchisee document shows that McDonald's tracks franchisees' departures from its recommendations in detail.

73. Since launching the McDonald's Pricing System in 2019, McDonald's has utilized Deloitte's Pricing Advisors as a tool to enforce compliance with the system's pricing recommendations. Pricing Advisors shared the pricing system's recommendations with

franchisees at periodic meetings. McDonald's operation of McOpCo restaurants further incentivizes it to force franchisees' compliance with pricing recommendations. In a truly competitive market, McOpCo restaurants would not be able to adopt recommended price increases if a franchisee-owned restaurant refused to adopt the same recommendation, because its prices would be lower and thereby attract more customers than the McOpCo restaurant. Accordingly, it is in McDonald's interest to force compliance across its franchises.

74. In August 2026, while discussing McDonald's Every Day Affordable Price ("EDAP") value menu, McDonald's CEO said that "we provide recommended guidance to our franchisees. So we're quite clear in terms of what we believe is the right pricing execution." Five franchisees told Reuters that McDonald's pressured them to use its pricing tools. A former franchisee described corporate officers placing calls when franchisees did not follow the recommendations and said of pricing, "You don't really have much of a choice anymore."

75. McDonald's links compliance to each franchisee's future as a licensed seller of McDonald's products. The franchise agreement declares adherence to McDonald's standards and policies to be "the essence of this Franchise," mandates "strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified," and obligates franchisees to "comply with all business policies, practices, and procedures imposed by McDonald's." On information and belief, McDonald's treats adherence to the McDonald's Pricing System recommendations as one of those standards and policies, as confirmed by its January 2026 requirement that franchisees be "constructively engaging with McDonald's approved Pricing Consultant and Tools."

76. Franchisees have "no right to renew or extend" their franchises. McDonald's evaluates each franchisee "throughout the franchise term" at "each Business Review" under the

National Franchising Standards, and a franchisee that has not consistently satisfied those standards is likely to not be granted a new term. A franchisee seeking to acquire additional restaurants must satisfy every National Franchising Standard and "support McDonald's Values and initiatives." McDonald's may "apply, modify or eliminate" these standards "as it deems appropriate." The stakes for franchisees are high: the estimated initial investment in a McDonald's restaurant ranges from $1,471,000 to $2,728,000.

77. McDonald's has made pricing an increasingly significant component of the Business Review. In December 2025, McDonald's disclosed that beginning January 1, 2026, it would "holistically assess the outcomes" of franchisees' pricing decisions made with "the Third-Party Pricing Advisors." The standards in effect as of January 2026 require franchisees to be "constructively engaging with McDonald's approved Pricing Consultant and Tools." In August 2026, speaking about franchisees that had not followed McDonald's EDAP pricing guidance, the McDonald's CEO explained that "as we're now doing our business reviews with franchisees, which affects things like growth and eligibility . . . pricing and pricing noncompliance in certain cases [are] part of those conversations" and that franchisees' comparative performance and Business Reviews "will be the things that get this fixed." Regardless of which way a given recommendation points, it is McDonald's—not the independent franchisee—that decides the "right pricing execution," and franchisees that depart from it must answer for that departure in their Business Reviews.

78. Put simply, McDonald's uses Deloitte's Pricing Advisors and its own Business Reviews to bring franchisees' prices in line with McDonald's own pricing decisions, and the consequences for franchisees that deviate from those decisions include refusal to renew their franchise licenses.

### H. Competing Restaurants Also Coordinate Directly

79. Competing McDonald's restaurants gather and make collective decisions through a variety of forums. The national advertising cooperative, Operator's National Advertising Fund ("OPNAD"), and local cooperatives are entities composed of McDonald's franchisees; McOpCo restaurants are voting members; OPNAD members elect regional representatives "with operating and decision making powers"; and McDonald's, which developed OPNAD, provides OPNAD with marketing and legal personnel free of charge. Although participation in OPNAD is nominally voluntary, McDonald's measures each franchisee's compliance with its "Operator Involvement standard"—one of the National Franchising Standards—based in part on the franchisee's "consistent involvement with OPNAD and local cooperatives."

80. McDonald's also endorses a group of national franchisee organizations, such as the National Franchisee Leadership Alliance ("NFLA"), which describes itself as the elected representative voice of McDonald's franchisee organizations throughout the United States. McDonald's franchisees are also represented by an independent group, the National Owners Association ("NOA"). In addition, McDonald's brings franchisees, suppliers, and employees together at its worldwide convention.

81. Competing McDonald's restaurants also meet with Deloitte. On information and belief, Deloitte's Pricing Advisors present pricing trends and guidance to franchisees at regional meetings held two to three times a year, giving competing McDonald's restaurants in each region a recurring forum for receiving shared pricing information and discussing pricing.

82. Using the McDonald's Pricing System, together with direct opportunities to conspire and McDonald's enforcement mechanisms, competing McDonald's restaurants conspired to raise and align customer-facing menu board prices. In 2024, McDonald's reported that "93% of our restaurants in the U.S. have committed to extending" a $5 meal deal. In 2025, the Chair of

the NFLA characterized the nationally advertised $5 and $8 Extra Value Meals as reflecting "the company and franchisees' shared commitment." And in 2026, McDonald's reported "unanimous alignment through the franchisee field votes" in favor of a value menu with nationally advertised prices.

83. McDonald's and its franchisees also manage price increases jointly. McDonald's CEO explained in July 2024 that "[a]s we absorb these cost increases in partnership with our franchisees, we look for ways to protect restaurant profitability via productivity efforts and selective price increases."

84. These statements demonstrate that competing McDonald's restaurants have both the means and the practice of setting prices collectively, contrary to McDonald's assertion that each franchisee sets its own prices independently.

### I. The McDonald's Pricing System Is Not Ancillary to any Legitimate Agreement

85. The McDonald's Pricing System is not mentioned anywhere in the franchise agreements. Rather, by their own terms, the "essence" of McDonald's franchise agreements is the promotion of consistent product and service quality, including "serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service and Cleanliness in the Restaurant operation."

86. Indeed, McDonald's 2025 Franchise Disclosure Statement noted that McDonald's "base" pricing engine was an "optional fee" for franchisees. Of course, the reality for franchisees was different from what McDonald's represented in this statement. However, it continues to demonstrate that the McDonald's Pricing System was not necessary to achieve the goals of the franchise agreements.

87. McDonald's public statements continuing to emphasize the independence of franchisees on matters of pricing further show that the McDonald's Pricing System is not ancillary to the franchise agreements.

88. Moreover, setting uniform prices via the McDonald's Pricing System does not relate to any procompetitive goal of the franchise agreements. McDonald's own public statements bear this out: executives have attributed McDonald's revenue growth since 2020 not to increased output or better products, but by "pushing through pricing [that] the consumer is tolerating [] well."

**J. Defendants Concealed the Conspiracy**

89. McDonald's has repeatedly represented, including in its annual reports and on investor calls, that franchisees independently set their own prices. For example, in April 2024, McDonald's CEO Christopher Kempczinski, addressing franchisees' financial position, told investors, "As you know, they control pricing." In May 2024, the President of McDonald's USA told customers that franchisees set menu prices and blamed price increases on the higher costs of running their businesses.

90. McDonald's has never revealed how the McDonald's Pricing System actually worked, for example, that its algorithm ran on pooled transaction data from competing McDonald's restaurants, that McDonald's supplied the rules and targets shaping each competing restaurant's recommendations, and that McDonald's tracked each franchisee's departures from those recommendations. And McDonald's annual reports say nothing about the McDonald's Pricing System, its data inputs, its rules, or McDonald's monitoring of franchisee compliance.

91. After Reuters published its report on the pricing engine on September 29, 2026, McDonald's issued a statement denying that its tools set prices and doubling down on its claim that franchisees independently set menu prices at their restaurants. A McDonald's executive even went so far as to publicly claim that Reuters had gotten the story wrong.

92. Before the Reuters report, these features of the McDonald's Pricing System (such as its pooled data inputs, its rules, and its monitoring of compliance) had not been publicly reported. Plaintiff could not have discovered the conspiracy through the exercise of reasonable diligence before September 29, 2026.

93. Defendants' fraudulent concealment has tolled any applicable limitations period. Moreover, every sale at a supracompetitive price constitutes a new overt act that restarts the limitations period with respect to that sale.

**K. Enforcement Context**

94. The U.S. Department of Justice has filed a Statement of Interest in other actions in this District, taking the position that competitors' use of a shared pricing algorithm to set benchmark or starting-point prices can constitute concerted action under Section 1 even where the competitors do not always follow the algorithm and that exchanging competitively sensitive information through an intermediary can violate the antitrust laws. *See, e.g.*, Statement of Interest of the United States, *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-06795, MDL No. 3121 (N.D. Ill. Mar. 27, 2025), ECF No. 382; Statement of Interest of the United States, *In re Frozen Potato Prods. Antitrust Litig.*, No. 1:24-cv-11801 (N.D. Ill. Feb. 27, 2026), ECF No. 266.

95. In October 2024, three U.S. Senators wrote to McDonald's CEO asking whether McDonald's price increases had outpaced inflation and requesting information about McDonald's pricing decisions, including how McDonald's decides prices for individual menu items, how often it reevaluates prices, and whether McDonald's "provide[s] guidelines to franchisees regarding pricing decisions." McDonald's publicly responded that the letter "demonstrates a lack of understanding of our franchise business model" and blamed its price increases on rising costs.

## V. EVIDENCE OF AGREEMENT

### A. Direct Evidence

96. McDonald's franchise agreements and policies set out an express agreement between McDonald's and each franchisee under which the franchisee will transmit its nonpublic transaction data to McDonald's, engage with McDonald's approved pricing consultant and tools, and comply with every policy McDonald's imposes, including policies on pricing, or otherwise face non-renewal of their franchise.

97. McDonald's public statements that it and its franchisees rely on the same third-party adviser, that McDonald's issues "our pricing recommendations" in "pricing round[s]," and that franchisees exhibit "very strong adherence" are direct evidence that competing restaurants agreed to delegate pricing to the McDonald's Pricing System and to follow its recommendations.

98. Franchisees' commitments, made through OPNAD and local cooperatives, to nationally advertised price points for menu items, the "unanimous alignment through the franchisee field votes," and system-wide efforts to set core menu pricing "as an entire system" are direct evidence that competing McDonald's restaurants set their prices collectively.

### B. Each Restaurant Knew that It Was Part of a System-Wide Arrangement

99. The conspiracy did not rest on each restaurant's individual dealings with McDonald's. Every McDonald's restaurant knew that its competitors set prices through the same required system, received recommendations generated in part from its competitors' data, knew that departures from the recommendations were tracked and enforced, and acted collectively on price with other restaurants.

100. McDonald's told investors that "[b]oth we and our franchisees" rely on the same third-party pricing adviser, and McDonald's Franchise Disclosure Document, which every franchisee receives and signs, discloses the fee for "the use of the Base Pricing Engine." The

pricing portal's own terms of service informed every user that the other users "may be competitors of each other."

101. Compliance is monitored. Deloitte's Pricing Advisors regularly meet with franchisees to push for greater adoption of McDonald's pricing recommendations. McDonald's tracks each franchisee's departures from the pricing recommendations in detail, and corporate officers call franchisees that deviate from them. Since 2026, "pricing noncompliance" has been a component of the Business Reviews that determine franchisees' "growth and eligibility."

102. Using the pricing system is mandatory. Since January 2026, McDonald's national franchising standards have obligated every franchisee to be "constructively engaging with McDonald's approved Pricing Consultant and Tools," and McDonald's assesses the outcomes of every franchisee's pricing decisions.

103. Franchisees act on price together. Through McDonald's advertising cooperatives, franchisees vote on nationally advertised price points. In 2025, they "voted to extend" advertising of a $2.99 price point, and McDonald's described developing pricing solutions like this "as an entire system."

104. Franchisees understood that control over pricing was shifting from individual restaurants to a common system. When franchisees formed the NOA in 2018, Blake Casper, a third-generation McDonald's franchise owner, warned that "[t]he next control change will be the transfer of Menu Board Pricing to Deloitte and Touche."

## C. Parallel Conduct

### 1. Parallel Adoption of the McDonald's Pricing System

105. Starting in or around 2019, McDonald's company-owned restaurants and its franchisees abandoned independent pricing and turned to the McDonald's Pricing System. By April 2019, franchisees were setting prices with Deloitte's "McDonald's Pricing Analyzer." By

2021, McDonald's reported that "both we and our franchisees" were using the same third-party adviser and that both took "a more consumer research-based approach than we would have several years ago."

106. Adoption of the McDonald's Pricing System was pervasive. McDonald's reported "very strong adherence" to its pricing recommendations in 2022 and "high" adoption rates for its pricing strategy in 2023. By 2026, McDonald's expressly required every franchisee to engage with its approved pricing consultant and tools.

107. This shift marked a sharp break from McDonald's past practice. McDonald's 2017 Franchise Disclosure Document identified no pricing tool.

**2. Parallel Price Increases**

108. Once they adopted the McDonald's Pricing System, McDonald's restaurants raised prices in parallel. McDonald's reported its annual U.S. price increases each year as single, system-wide figures—approximately 6% in 2021 and approximately 10% in each of 2022 and 2023—reflecting increases implemented across company-owned and franchised restaurants alike.

109. The increases were synchronized. McDonald's took "smaller, more frequent increases" in system-wide "pricing round[s]," assessing each round before it could "decide what we might do next," and raised prices a "few times a year."

110. The increases extended throughout the menu. From 2019 to 2024, average prices for McDonald's core items rose between 20% and 44%, and the price of the average menu item rose roughly 40%.

111. Company-owned and franchised restaurants moved in tandem. The CFO of McDonald's praised "the discipline that both our owner/operators and our company restaurants are bringing" to pricing.

112. After the McDonald's Pricing System was adopted, the pace of increases accelerated sharply—from approximately 2% to 3% in 2019 to approximately 6% in 2021 and approximately 10% in each of 2022 and 2023.

### D. Plus Factors

113. Numerous plus factors confirm that Defendants' parallel conduct was the product of agreement, not independent decision-making.

#### 1. Exchange of Competitively Sensitive Information

114. Each restaurant provided its current, detailed, nonpublic transaction data to a common hub that used the pooled data to generate its competitors' recommended prices. No independent business would permit its confidential data to inform its rivals' prices unless it expected its rivals to reciprocate.

#### 2. Actions Against Unilateral Self-Interest

115. Each McDonald's restaurant turned its pricing decisions over to a common agent. Instead of setting prices based on its own costs, customers, and competitive judgment, each restaurant priced according to recommendations generated by the same engine, from the same pooled data, and under rules supplied by McDonald's for every competing McDonald's restaurant. No independent competitor hands its pricing to the same decision-maker that sets its rivals' prices unless it expects its rivals to do the same.

116. In a competitive market, a restaurant confronting double-digit increases at nearby McDonald's restaurants would have an incentive to undercut them and poach their customers. McDonald's itself designed its system so that franchisees would compete with other McDonald's restaurants. Instead, restaurants followed common recommendations with "very strong adherence."

117. Restaurants kept raising prices even as guest counts declined. McDonald's reported that 2024 U.S. comparable sales benefited from average check growth "partly offset by negative comparable guest counts." The decline has persisted: Reuters reports that U.S. foot traffic at McDonald's fell year over year in every complete month from March through August 2026. In a competitive market, falling customer counts produce lower prices, not higher ones. Meanwhile, as Figure 5 shows, McDonald's U.S. operating income increased 43%, from $4.07 billion in 2019 to $5.81 billion in 2025.

**FIGURE 5: McDonald's U.S. Operating Income, 2019–2025**




118. Each franchisee also submitted to monitoring of its compliance with the recommendations. McDonald's tracks each franchisee's departures from pricing recommendations, and "pricing noncompliance" is part of the Business Reviews that determine franchisees' "growth and eligibility." No independent business would accept policing of whether it follows prices derived from its competitors' data unless the arrangement bound its competitors as well.

### 3. Market Conditions Conducive to Collusion

119. The market for McDonald's menu items has structural characteristics that make coordinated pricing easy to implement, monitor, and sustain.

120. *Inelastic demand.* Because customers absorb McDonald's price increases with limited loss of sales, coordinated increases are profitable. McDonald's reported that it continued to see "flow-through of 70% to 80% of those price increases." Its CEO told investors that "even though we're pushing through pricing, the consumer is tolerating it well," and attributed McDonald's "ability to actually push through the pricing" to its brand, "there is no substitute for a Big Mac."

121. *Homogeneous products.* McDonald's restaurants sell a uniform menu of standardized products, which makes coordination simple to implement and monitor. Through the McDonald's Pricing System, McDonald's sees each restaurant's prices daily.

### 4. Opportunities and Mechanisms to Collude

122. Representatives of competing McDonald's restaurants meet regularly through OPNAD, local cooperatives, franchisee field votes, McDonald's-endorsed franchisee organizations, McDonald's Worldwide Convention, and Business Reviews.

## VI. RELEVANT MARKET AND MARKET POWER

123. Defendants' conduct constitutes a horizontal price-fixing conspiracy that is unlawful *per se*, and no showing of market power or anticompetitive effects is therefore required. *Deslandes*, 81 F.4th at 703. Plaintiff nevertheless alleges the relevant markets below because Defendants' conduct is also unlawful under the rule of reason.

124. Defendants' ability to raise prices every year from 2019 through 2026—including by approximately 10% per year in 2022 and 2023—directly demonstrates their market power.

125. To the extent a relevant product market must be defined, it is the sale of meals and menu items to consumers by quick-service hamburger restaurants (the "QSR Hamburger Market"). Quick-service hamburger restaurants—such as McDonald's, Burger King, and Wendy's—offer low-priced, hamburger-centered menus with fast service and counter, drive-through, and mobile ordering. Consumers do not view full-service restaurants, fast-casual restaurants, other categories of quick-service restaurants, or food purchased at grocery stores as reasonably interchangeable with quick-service hamburger meals. McDonald's itself evaluates competition by food category, telling investors that it leads "by a wide margin in beef with more than 40% share in a $50 billion category." And the McDonald's Pricing System draws in the menu prices of nearby Wendy's and Burger King restaurants, reflecting McDonald's own view of which competitors constrain its restaurants' prices.

126. The relevant geographic market is the United States. The McDonald's Pricing System centrally generates recommendations for restaurants across the country using an algorithm that utilizes data pooled from restaurants across the country. McDonald's issues pricing guidance to all U.S. franchisees on the same schedule, enforces pricing through national franchising standards, and reports U.S. pricing as a single system-wide figure. McDonald's also sets nationally advertised price points through nationwide franchisee votes.

127. Customers throughout the United States purchase the same products under the same conditions. Every McDonald's restaurant must serve "only designated food and beverage products" under the "uniform operation of all McDonald's restaurants," and McDonald's markets its products and its price points, to customers nationwide through national advertising. In 2024 and 2025, McDonald's advertised a $5 Meal Deal and $5 and $8 Extra Value Meals to customers nationwide. No matter where a customer buys McDonald's, the customer encounters the same

menu, the same nationally advertised prices, and prices generated by the same McDonald's Pricing System. The conspiracy's effects on price are therefore national in scope.

128. Alternatively, the relevant geographic markets are the Metropolitan Statistical Areas ("MSAs") in which McDonald's restaurants are located. Customers buy from McDonald's restaurants near where they live, work, and travel, and choose among the restaurants within that area when they want to buy McDonald's menu items. McDonald's tells prospective franchisees that "customers typically patronize various McDonald's restaurants depending on their travel patterns" and that other McDonald's restaurants "may have an effect on the sales of your McDonald's restaurant."

129. Convenience defines the area within which customers look for alternatives. About 95% of U.S. McDonald's restaurants operate drive-thrus. MSAs approximate the areas within which customers make these choices, because the federal government delineates each MSA around an urban core and the surrounding counties tied to it by commuting.

130. McDonald's itself analyzes pricing both nationally and at more local levels. Within each MSA, the McDonald's Pricing System generated recommendations for every McDonald's restaurant using the same rules and the same pooled data.

## VII. ANTITRUST INJURY

131. Plaintiff and Class members have antitrust standing. Class members who purchased from McOpCo restaurants purchased directly from Defendants. Class members who purchased from franchised restaurants bought directly from McDonald's franchisees, each of which is a co-conspirator that used the McDonald's Pricing System, sent its transaction data to McDonald's, received the system's recommendations, and is bound by the National Franchising Standards.

132. Defendants' conspiracy eliminated independent price competition among McDonald's restaurants. Absent the conspiracy, each restaurant would have priced menu items independently, and competition among company-owned and franchised McDonald's restaurants—competition McDonald's itself designed its system to create—would have constrained those prices.

133. Instead, the McDonald's Pricing System drove up prices at every restaurant that followed its recommendations. Because the system produced recommendations for every menu item at every restaurant using the same rules and the same pooled data, the resulting overcharges affected purchasers across the United States, across menu items, throughout the Class Period.

134. The conspiracy also suppressed the competitive pressure that otherwise would have disciplined each restaurant's prices. Because the same system generated the recommendations for every competing McDonald's restaurant from the same pooled data, each restaurant could raise its prices with less risk of being undercut by nearby McDonald's competitors.

135. The overcharges continue. The price increases implemented through the McDonald's Pricing System have not been rolled back, and McDonald's current value offers are discounts off those already elevated prices.

136. Plaintiff and Class members purchased menu items directly from Defendants or their co-conspirators and paid supracompetitive prices as a result. They are the first purchasers from members of the conspiracy and the parties most directly harmed by it.

137. Paying inflated prices caused by an agreement among competitors to restrain price competition is precisely the kind of injury the antitrust laws were designed to prevent, and Defendants' conduct is accordingly unlawful.

138. The overcharges can be measured on a class-wide basis with common evidence, including the McDonald's Pricing System's recommendations and the restaurant-level transaction data that McDonald's collects for every restaurant.

## VIII. CLASS ACTION ALLEGATIONS

139. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following class (the "Class"):

> All persons and entities in the United States who purchased one or more menu items from a McDonald's restaurant in the United States, whether operated by McDonald's or by a franchisee, from January 1, 2019, until the effects of Defendants' conduct cease (the "Class Period").

140. Excluded from the Class are Defendants, all McDonald's franchisees, their officers and directors, and any judicial officer assigned to this case, together with that officer's immediate family and staff.

141. *Numerosity.* The Class comprises many millions of members, making joinder impracticable.

142. *Commonality and Predominance.* Questions common to the Class predominate over any individual questions, including: (a) whether Defendants and their co-conspirators agreed to fix, raise, maintain, or stabilize menu prices through the McDonald's Pricing System; (b) whether Defendants exchanged competitively sensitive information through the McDonald's Pricing System; (c) whether the conduct raised prices for McDonald's menu items; (d) the measure of class-wide damages; and (g) the appropriate injunctive relief.

143. *Typicality.* Plaintiff's claims arise from the same conduct, and rest on the same legal theories, as the claims of all Class members.

144. *Adequacy.* Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in antitrust class actions.

145. *Superiority.* A class action is superior to other available methods of adjudication because individual damages are small relative to the cost of litigating complex antitrust claims.

146. *Injunctive Relief.* Defendants have acted on grounds generally applicable to the Class, making injunctive relief appropriate for the Class as a whole.

## IX. COUNT I—VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §1 (PRICE FIXING)

147. Plaintiff repeats and incorporates by reference each of the preceding allegations as though fully set forth herein.

148. From no later than 2019 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy to fix, raise, maintain, and stabilize the prices of menu items sold at McDonald's restaurants in the United States.

149. The conspiracy consisted of an agreement among competing McDonald's restaurants—both company-owned and franchised—that was organized and enforced by McDonald's, to delegate pricing to the McDonald's Pricing System, feed that system their nonpublic transaction data, receive restaurant-level price recommendations generated from their competitors' pooled data, and adhere to those recommendations.

150. In furtherance of the conspiracy, Defendants and their co-conspirators, among other things: (a) sent nonpublic transaction data to McDonald's for use in the McDonald's Pricing System; (b) received and implemented restaurant-level and item-level price recommendations in coordinated pricing rounds; (c) applied McDonald's rules and corporate targets to generate recommendations for competing restaurants; (d) monitored compliance and recorded deviations from pricing recommendations; (e) made pricing compliance a part of Business Reviews affecting renewal and growth; and (f) agreed to nationally advertised price points through cooperatives and field votes.

151. The conspiracy is a horizontal agreement among competitors to fix prices and is unlawful *per se*. McDonald's participates both as the conspiracy's organizer and, through its McOpCo restaurants, as a competitor of the franchisee co-conspirators.

152. Alternatively, the conspiracy is unlawful under a quick-look analysis, because its anticompetitive effect on prices is obvious, or under the rule of reason. The conspiracy produced substantial anticompetitive effects, including higher prices and the elimination of independent price competition among McDonald's restaurants, and Defendants possess market power as alleged above.

153. The conspiracy is not reasonably necessary to achieve any legitimate procompetitive objective. Any procompetitive justification could be achieved through substantially less restrictive means, including pricing tools that do not use competitors' nonpublic data and are not tied to renewal or growth.

154. Each Defendant knowingly participated in the conspiracy and is jointly and severally liable for the overcharges it caused.

155. As a direct and proximate result of the conspiracy, Plaintiff and the Class members paid supracompetitive prices and were injured in their business or property. They are entitled to treble damages, costs, and attorneys' fees pursuant to 15 U.S.C. §15.

156. Plaintiff and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, equitable relief, and damages.

## X. COUNT II—VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §1 (INFORMATION EXCHANGE)

157. Plaintiff repeats and incorporates by reference each of the preceding allegations as though fully set forth herein.

158. Defendants and their co-conspirators agreed to exchange competitively sensitive information through the McDonald's Pricing System and to use that information to generate each restaurant's prices.

159. The information exchanged was current, granular, and nonpublic. It encompassed each restaurant's transaction-level sales, prices, and product mix, as well as monthly restaurant-level profit and loss statements. None of that information was available to consumers or to the public.

160. The information was exchanged among horizontal competitors. By McDonald's own design, its company-owned restaurants and franchised restaurants compete with one another for the same customers.

161. The exchange was continuous and centralized. Every restaurant's transaction data flows to McDonald's, and the McDonald's Pricing System uses the pooled data to produce restaurant-level and item-level price recommendations for competing restaurants.

162. McDonald's menu items have an inelastic demand curve. McDonald's can raise the prices of its menu items without a significant decrease in demand or causing customers to switch their fast food purchases to another restaurant in the QSR Hamburger Market.

163. The structure of the market makes the information exchange particularly likely to harm competition. McDonald's restaurants sell standardized products under a uniform system, and McDonald's monitors compliance and enforces it through renewal and growth decisions.

164. The exchange is unlawful under the rule of reason. It actually reduced price competition and raised prices, and it served no legitimate procompetitive purpose that could not have been achieved through less restrictive means.

165. As a direct and proximate result, Plaintiff and the Class members paid supracompetitive prices and are entitled to treble damages, costs, attorneys' fees, and injunctive relief pursuant to 15 U.S.C. §§15 and 26.

166. Plaintiff and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, equitable relief, and damages.

## XI. PRAYER FOR RELIEF

167. WHEREFORE, Plaintiff, Brian Allaire, respectfully requests that the Court enter judgment against Defendants and grant the following relief:

A. an order certifying the Class under Rule 23, appointing Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel;

B. a declaration that Defendants' conduct violates Section 1 of the Sherman Act;

C. an award to Plaintiff and the Class of damages in an amount to be determined at trial, trebled;

D. a permanent injunction prohibiting Defendants from: (i) using the nonpublic data of any franchisee or McOpCo restaurant to generate pricing recommendations for competing restaurants; (ii) monitoring franchisees' adherence to pricing recommendations, or considering pricing compliance in Business Reviews or in renewal or growth decisions; and (iii) entering into any similar arrangement;

E. an award of pre- and post-judgment interest;

F. an award of attorneys' fees and costs; and

G. such other relief as the Court deems just.

## XII. JURY DEMAND

168. Plaintiff demands a trial by jury on all issues so triable.

Dated: November 3, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Karin E. Garvey
Karin E. Garvey (N.D. Ill. Bar No. 2997831)
Daniel F. Loud*
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
kgarvey@scott-scott.com
dloud@scott-scott.com

Michael Srodoski*
Erin Dennehy*
156 S. Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
msrodoski@scott-scott.com
edennehy@scott-scott.com

*Counsel for Plaintiff Brian Allaire and the Proposed Class*

**Pro hac vice* applications forthcoming